**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JOE R. LARA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-02434 |
| | § | |
| DIRK KEMPTHORNE, Secretary of the | § | |
| Department of the Interior, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

The plaintiff, Joe Lara, filed this suit alleging that his former employer, the Department of the Interior, discriminated against him by failing to promote him and retaliated against him for complaining about the discrimination. Lara worked in the Office of Mineral Management Services (MMS) for the Department. Lara's discrimination claim is based on his failure to receive a promotion to the position of Lead RIK Specialist within the MMS. Lara, who is male and Hispanic, alleges discrimination on the basis of his race, national origin, and sex; a hostile work environment; and retaliation for complaining about the discrimination.

After discovery, the Secretary moved for summary judgment on all claims, (Docket Entry No. 13), Lara responded, (Docket Entry No. 15), and the Secretary replied (Docket Entry No. 17). Based on a careful review of the complaint; the motion, response, and reply; the record; and the applicable law, this court concludes that the undisputed facts entitle the Secretary to judgment as a matter of law. The motion for summary judgment is granted and final judgment is entered by separate order. The reasons for this ruling are explained below.

# I.     The Applicable Legal Standards

## A.     Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated

assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B.     Title VII and § 1981

#### 1.     Discrimination

Lara alleges racial, sex, and national origin discrimination under 42 U.S.C. § 2000e 2(a) and racial discrimination under 42 U.S.C. § 1981. The standards under Title VII and § 1981 are the same. *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1233-34 (5th Cir. 1989). Intentional discrimination can be proven by either direct or circumstantial evidence. *Burrell v. Dr. Pepper/Seven Up Bottling Group*, *Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). Evidence is "direct" if it would prove the fact in question without inference or presumption. *Jones v. Robinson Property Group*, *L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citations omitted). If there is no direct evidence, the court uses the familiar burden-shifting framework created by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* a plaintiff alleging a discriminatory failure to promote must first make a *prima facie* showing that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he did not receive the position; and (4) the person selected was outside the protected class. *See id.*; *Strong v. Univ. Healthcare System*, *L.L.C.*, 482 F.3d 802, 805-06 (5th Cir. 2007).

If the plaintiff makes the *prima facie* showing, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the failure to promote. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the defendant meets this burden, the plaintiff must then create a genuine issue of material fact that: (1) the defendant's reason is not true, but is instead a pretext for discrimination; or (2) the defendant's reason, while true, is only one of the reasons for its conduct and that

3

discrimination was a motivating factor in the defendant's decision.  *See Burrell*, 482 F.3d at 411-12 (citations omitted).  The plaintiff can meet this burden "by producing circumstantial evidence sufficient to create a fact issue as to whether the employer's nondiscriminatory reasons are merely pretext for discrimination." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354 (5th Cir. 2005).  The United States Supreme Court, in *Reeves v. Sanderson Plumbing Prods.,* stated that "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." 530 U.S. 133, 143 (2000) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981)).

A plaintiff may show pretext by demonstrating that the proffered reasons for the challenged employment action are false or "unworthy of credence." *Nasti v. CIBA Speciality Chemicals Corp.*, 492 F.3d 589, 593 (5th Cir. 2007) (citations omitted).  If the plaintiff can show that the proffered explanation is merely pretextual, that showing, when coupled with the *prima facie* case, will usually be sufficient to survive summary judgment.  *Reeves*, 530 U.S. at 146-48.  In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus.  *Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004).  The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated on the basis of the plaintiff's membership in the protected class.  *Reeves*, 530 U.S. at 143.  Once a Title VII discrimination case reaches the pretext stage, the question on summary judgment is whether there is a conflict in substantial evidence to create a jury question on discrimination.

2.    *A Hostile Work Environment*

4

The elements of a hostile work environment claim are that: (1) the plaintiff belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known of the harassment, yet failed to take prompt remedial action.  *Felton v. Polles,* 315 F.3d 470, 484 (5th Cir.2002).  The fifth element is not required when the alleged harasser is a supervisor with immediate or successively higher authority over the plaintiff.  *See Celestine v. Petroleos de Venezuela SA,* 266 F.3d 343, 353-54 (5th Cir. 2001)  (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

The Supreme Court has explained that in determining whether workplace conditions are a hostile work environment, courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).  For harassment to be actionable, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Ramsey*, 286 F.3d at 268 (internal quotation marks and citation omitted); *Watkins v. Texas Dept. of Criminal Justice*, 269 Fed. App'x 457, 463-464 (5th Cir. 2008).  "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so."  *Harvill v. Westward Communications LLC*, 433 F.3d 428, 434 (5th Cir. 2005) (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)).  The Supreme Court has made clear  "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher*, 524

5

U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

        *3.    Retaliation*

Title VII makes it an unlawful employment practice for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a) (1994).  To make a *prima facie* showing of retaliation under Title VII, a plaintiff must show that: "(1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the  protected activity and the adverse employment action."  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate nonretaliatory reason for the employment action.  If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation.  *Id.*  The standard of proof on the causation element of a Title VII claim is that the adverse employment action taken against the plaintiff would not have occurred "but for" her protected conduct.  *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).  In *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006), the Supreme Court held that the antiretaliation provision of Title VII is not limited to discriminatory actions that affect the terms and conditions of employment.  The provision "does not protect an individual from all retaliation, however, but only from retaliation that produces an 'injury or harm'" *Id.* at 67.  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which

6

in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotations omitted). The standard for harm is objective. *Id.* The harm must be material; Title VII does not protect an employee from trivial harms, "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* The significance of any given act depends on the particular circumstances of the individual employee. *Id.* at 69.

## II.   The Summary Judgment Evidence[1]

---

[1]

In support of his motion for summary judgment, the Secretary submitted the following evidence: Lara's deposition (Docket Entry No. 14, Ex. 1); the report of the investigation into Lara's discrimination complaint (*Id.*, Ex. 2); Lara's EEO Complaint (*Id.*, Ex. 3); the Order from the Administrative Judge for an expedited investigation and withdrawal without prejudice of the pending investigation (*Id.*, Ex. 4); the affidavit of Bernadette Muniz (*Id.*, Ex. 5); a copy of the posting for the Lead RIK Specialist position (*Id.*, Ex. 6); a list of the rankings of the candidates for the Lead RIK Specialist position (*Id.*, Ex. 7); the interview questions used in interviews for the Lead RIK Specialist position (*Id.*, Ex. 8); the affidavit of Judith Clark (*Id.*, Ex. 9); Suzanne Elmore's resume (*Id.*, Ex. 10); Lara's interrogatory responses (*Id.*, Ex. 11); and the deposition of Clifford Coston (*Id.*, Ex. 12). In support of his response in opposition to the Secretary's motion, Lara submitted the following evidence: a copy of the posting for the Lead RIK Specialist position (Docket Entry No. 16, Ex. 1); the deposition of Clifford Coston (*Id.*, Ex. 2); automated e-mails from the Human Resources Office of MMS to Lara announcing an open position of Supervisory Minerals Revenue Specialist; notifying Lara that his application had been received for the position, and informing him another applicant had been selected (*Id.*, Ex. 5); an e-mail from Coston to Lara discussing Lara's personal radio use at the office (*Id.*, Ex. 7); the affidavit of Felicia Lopez (*Id.*, Ex. 8); the affidavit of M. Diana de la Garza (*Id.*, Ex. 9); an e-mail exchange between Lara and Patricia Johnson, another employee of MMS (*Id.*, Ex. 10); an e-mail exchange between Lara and Coston about Lara's review (*Id.*, Ex. 11); an e-mail from Lara to Barbara Marquez dated July 5, 2007, stating that he had not received any review notes from Coston on cases Lara submitted, also stating that he applied for Lead Revenue Specialist and that he heard there was a list of "lazy people" in the office that the managers had, and that Lara's name was on it (*Id.*, Ex. 12); an e-mail from Lara to Dee Thompson, dated October 10, 2007, indicating Lara wanted to attend a training class (*Id.*, Ex. 13); an e-mail from Coston to Lara, dated April 11, 2007, informing Lara that because of a lack of progress on his projects Lara would probably not be able to attend training out of the office (*Id.*, Ex. 14); a set of e-mails showing that Lara made a training presentation on March 27, 2007, and that Carol Green delegated her authority to Lara while she was out of the office on December 7, 2006 (*Id.*, Ex. 15); an e-mail from Lara to Barbara Marquez and Mark Reynolds, dated October 15, 2007, stating that Lara had been denied telecommuting privileges while others had not, and an e-mail from the same date from Lara to Lonnie Kimball asking to discuss documents related to the denial of his telecommuting privileges (*Id.*, Ex. 16); a copy of the telecommuting schedule for Carol Green's team (*Id.*, Ex. 17); a page from the 2004 Property Status End-to-End Database, dated October 15, 2007, listing property specialists, their percentage of complete properties and whether or not they were telecommuting (*Id.*, Ex. 18); property totals for Curtis Williams and Lara, dated October 15, 2007 (*Id.*, Ex. 19); an e-mail exchange between Lara and Pat Johnson, dated October

## A.    The Promotion Decision

Lara  began working for the Minerals Management Service of the U.S. Department of the Interior (MMS) as an auditor in February 1990.  (Docket Entry No. 1).  He received several pay increases over the next 18 years, participated in several agency projects, provided training to his peers, and received performance ratings that were primarily "satisfactory," with some "superior." (Docket Entry No. 1 at 3, No. 5 at 3).  In 2006, Lara applied for the new position of Lead RIK Revenue Specialist.  He was not selected.  (Docket Entry No. 5 at 3).  Lara alleges that race and sex discrimination are the reasons he did not achieve the promotion.  He alleges that during the selection process for the position, people of "Hispanic Origin" were interviewed under "unfair and unequal circumstances."  (Docket Entry No. 1 at 3).  He also alleges that when he applied, "there was an influx of females being moved up the ranks."  (*Id*.).  The person selected was a non-Hispanic woman.

The posting for the position described two vacancies, one in Houston and one in Lakewood, Colorado.  (Docket Entry No. 16, Ex. 1).  Only one opening was filled, and it was in Denver. According to the report of the investigation into Lara's discrimination complaint, MMS management originally authorized positions in both Colorado and Houston but decided to fill one position

---

15, 2007, discussing their telecommuting schedules (*Id*., Ex. 20); a series of e-mails between Lara, Coston, Barbara Marquez and Carol Green, dated September 25, 2007, discussing Lara's performance review, and an e-mail exchange between Marquez and Lara, dated September 26-27, 2007, in which Lara stated that he would like to discuss a hostile work environment and scheduled a phone call with Marquez (*Id*., Ex. 21); an e-mail exchange between Lara and Coston, dated September 26, 2007, discussing how much time Lara would need to complete an assignment, and including an attachment of an assignment from Lara to Coston (*Id*., Ex. 22); an e-mail from Lara to Carol Green, dated May 10, 2007, detailing his complaints about Coston (*Id*., Ex. 23); an e-mail exchange between Lara, Coston, Green and Marquez, dated September 25, 2007, describing a meeting between Coston and Lara in Coston's office (*Id*., Ex. 24); an e-mail from Coston to Lara, dated August 15, 2007, asking to see Lara to review an assignment due to serious concerns about the assignment (*Id*., Ex. 25); an e-mail from Lara to Mark Reynolds, dated September 26, 2007, containing complaints from Lara about Coston (*Id*., Ex. 26); and the affidavit of Wanda Robinson, an auditor with MMS (Docket Entry No. 18).

immediately and delay "filling the other position due to a possible transfer of another employee and budget concerns."  (Docket Entry No. 14, Ex. 2 at 10).

The position was open to applicants from within MMS and to individuals outside the government.  (Docket Entry No. 14, Ex. 5 at 22).  Seventeen applications were received, and all seventeen applicants were interviewed.  (*Id*. at 26).  All Houston-based candidates were interviewed by telephone while all Denver-based candidates interviewed in person.

The summary judgment evidence shows that Lara applied for the position online in March 2006.  His interview for the position was conducted over the phone with representatives of the MMS Denver, Colorado office.  (Docket Entry No. 13 at 2).  The Secretary submitted the affidavit of Bernadette Muniz, the official in charge of selecting a candidate for the position.  (Docket Entry No. 14, Ex. 5).  Muniz stated that before interviewing the seventeen candidates, she and her fellow panelists ranked them according to their answers to questions that were posted online with the vacancy announcement and their resumes.  (*Id.* at 26).  The answers to the vacancy announcement questions were worth twenty percent, the resumes were worth thirty percent, and the interview was worth fifty percent of a candidate's overall score.  (*Id.* at 27).  The panel was made up of three women.  After Muniz and the panel interviewed all seventeen candidates, Susan Elmore ranked at the top of all three panelists' lists.  (*Id*.).

The Secretary submitted a list of all of the candidates' scores.  The list shows that Elmore had the highest overall score of 89, while Lara had a score of 68.  (Docket Entry No. 14, Ex. 7).  Lara ranked eleventh out of the seventeen candidates.  Muniz stated in her affidavit that Lara's interview was "okay" but "not great," and that he had not shown the "leadership" or had "level of responsibility" that Elmore had.  (Docket Entry No. 14, Ex. 5 at 33-34).  Muniz stated that Lara did

not have the type of background the panel was looking for in filling the position.  (*Id*.).

The Secretary also submitted the affidavit of Judith Clark, another member of the MMS interview panel.  (Docket Entry No. 14, Ex. 9).  Clark stated that the panelists all ranked Suzanne Elmore first because of her responses to the interview questions and her background.  (*Id.* at 29).  Overall the interview panel found that Elmore was the best candidate for the position and offered her the job.  (*Id.*).

Elmore's resume shows that before MMS hired her for the position of Lead RIK Specialist, she had worked for almost two years as a RIK Specialist for Strategic Petroleum Reserve.  (Docket Entry No. 14, Ex. 10 at 2).  Before that, Elmore had worked for three years as an "oil valuation analyst," contracting with Exxon Mobil through Kelly Financial Services.  (*Id*.).  For two years before that position, Elmore was an audit analyst with Exxon Mobil.  (*Id*. at 3).  Elmore worked as an oil and gas royalty accountant with Continental Resources for three years before her time with Exxon Mobil.  (*Id*. at 4).  According to his deposition, Lara graduated from Corpus Christi A&M University with a B.A. in Accounting in 1987.  (Docket Entry No. 14, Ex. 1 at 6).  He worked for a "construction insulation installer" for two years, and then began working as an auditor with MMS in 1990.  (*Id*.).  Lara began at a "G5" paygrade, and when he interviewed was at a "G12" paygrade.  (*Id*. at 7).

Lara submitted the affidavit of Wanda Robinson, an auditor for MMS.  (Docket Entry No. 18).  Robinson stated that "Suzanne Elmore was selected for the position of which other candidates mainly minorities were more qualified. . . . Suzanne was given special treatment in that she was located in Denver and was given the opportunity to do the work of which was part of the hiring process, although a position in Houston where the majority of companies and the bulk of the

10

minorities are located." (*Id.* at 1). Robinson also stated "[t]he interview process showed disparate treatment against the minorities in Houston as everyone was not interviewed in the same manner as the ones in Denver." (*Id.* at 2). Lara asserts that during the interview, "there was a lot of giggling going on on the other line," (Docket Entry No. 14, Ex. 1 at 14-15), showing "inattentive behavior." (Docket Entry No. 15 at 5). In his deposition, Lara stated that he believed he did "quite well" in answering the questions in his phone interview and that Suzanne Elmore was less qualified. (Docket Entry No. 14, Ex. 1 at 16).

### B.    The Alleged Retaliation and Hostile Work Environment

In November 2006, Lara filed an EEO complaint stating that MMS's employment practices "have had a disparate and adverse impact on Hispanic applicants as can be observed by the minimal number of successful Hispanic promotions throughout the years." (Docket Entry No. 1 at 4). His EEO complaint stated: "I was at a disadvantage and discriminated against during the interview phase of this selection process. I discovered that the Selectee was given an interview in person and I was interviewed over the phone." (Docket Entry No. 14, Ex. 3). Lara's complaint was investigated and a hearing held before an Administrative Judge. (Docket Entry No. 13 at 5). The Administrative Judge ended the hearing and ordered an expedited investigation of new allegations of discrimination. (*Id.*). After the investigation, Lara withdrew his request for a hearing and filed this lawsuit. (*Id.*).    Lara maintains that the alleged acts of retaliation he suffered after he filed his EEO complaint created a hostile work environment. Lara alleges that as a Hispanic male "he was subjected to multiple forms of harassment, such as, singling out, disparate treatment, and verbal and mental abuse" and "the harassment was at least partially motivated by [Lara's] race and or gender as proven by the fact that people outside of his protected classes were treated more favorably."

11

(Docket Entry No. 15 at 11).  Lara argues that the alleged ongoing harassment at MMS "caused him to lose career advancement opportunities, to receive a lower rating than actually earned, to miss opportunities for projects . . . ."  (*Id*.).  According to Lara, much of the alleged harassment occurred "in public, in front of peers and other supervisors, which made him feel humiliated, degraded and embarrassed."  (*Id*. at 12).

Lara alleges that after he filed his EEO complaint, he was "denied the ability to participate in projects he had previously led and for which he was highly recommended."  (Docket Entry No. 1 at 4).  He also alleges that although he was and continues to be "'in need of development,' yet coaching and development have been denied, while peers of non-Hispanic origin have received and continue to receive coaching and development."  (*Id*.).  In his deposition, Lara testified about specific incidents that he believed were acts of retaliation.  These include "being singled out" for playing his personal radio at his desk, his work "not being reviewed timely," not receiving confirmation of his vacation request until the day before he left for vacation, yelling by his supervisor, Clifford Coston, who Lara says "talked to me as if I was a child and not a professional," and being asked to print everything from his "My Documents" computer drive.  (Docket Entry No. 14, Ex. 1 at 25-26).  Lara maintains that the "usage of a personal radio is a common general practice by most employees of MMS" and that his fellow employees "did not find his music to be louder or more disruptive than anyone else's."  (Docket Entry No. 15 at 8).  Lara alleges that he received a "consistent array of negative e-mails from his supervisor," that he was "consistently talked down to and diminished in front of his peers during meetings" and was also constantly "yelled at" by Coston in his office.  (*Id*.).  Lara states that "no one else was treated this way" and that Coston did not provide Lara with any of the coaching or training required by MMS policy.  (*Id*.).  Lara asserts

that the only people Coston coached were females.  (*Id*.).

Lara alleges that Coston denied him the "right to telecommute." (Docket Entry No. 15 at 10).  Lara also argues that Coston ignored a vacation request "while other peers similarly situated had leaves approved within 24 hours."  (*Id*. at 9).  Lara alleges that Coston did his "yearly performance review done over the phone."  (*Id*.).  Lara alleges that when he "requested an explanation" of his low rating in that evaluation, Coston threatened to lower the rating further. (Docket Entry No. 1 at 6-7).  Lara argues that because the alleged instances of retaliation were consistent and frequent, they qualify as retaliation "under the continuing violation theory." (Docket Entry No. 15 at 7).

The Secretary argues that Lara cannot make a *prima facie* showing of a causal connection between "the alleged retaliatory acts and his protected activity." (Docket Entry No. 13 at 15).  The Secretary maintains that Lara's complaint to the EEO "occurred well before the actions in question" and that Coston, the supervisor allegedly responsible for the retaliatory acts, had nothing to do with the selection for the specialist position.  (*Id.* at 15-16).

The Secretary argues that the incidents Lara complains of as retaliation "do not rise to the level of actionable employment actions" but are merely workplace annoyances.  (*Id.* at 16).  The Secretary argues that the lower performance rating Lara received in 2007 was warranted.  (Docket Entry No. 5 at 6).  The Secretary denies that Lara was "continuously confronted with verbally abusive behavior" by his supervisor, that he was "singled out to print out all of the documents in his 'my documents' folder" on his computer, and denies that he was sent negative e-mails by his supervisor.  (*Id*.).  The Secretary does admit that Lara was asked to turn off his personal radio or wear headphones because other employees had complained of the volume.  (*Id*.).  The Secretary

13

acknowledges that on one occasion, Lara was denied the opportunity to telecommute, but states that all the evidence shows that Lara's team members were denied the opportunity on that occasion because of the volume of work to be completed.  (*Id*.).  The Secretary acknowledges that the approval of one of Lara's vacation requests was delayed, but only because it required approval from higher managers.  (*Id*.). The Secretary admits that Lara's performance review was discussed over the phone rather than in person but only because the supervisor was out of town at the time.  (Docket Entry No. 5 at 7).  The Secretary denies that Lara was ever threatened by his supervisor.  (*Id*.).

In his testimony, Coston stated that when he was Lara's supervisor, Lara's work was unsatisfactory and did not comply with MMS's written procedures.  (Docket Entry No. 14, Ex. 12 at 14-15).  Coston admitted that although Lara needed to improve his performance, Coston did not provide him with much coaching.  Coston stated that he had provided coaching to other employees based on their "grade."  (*Id*. at 36).  According to Coston, if an auditor is at grade 12 he or she has the knowledge to do their job, and should actually be training the lower grade employees themselves.  (*Id*.).   In his deposition, Lara stated that he sent requests Coston asking to attend training sessions outside Houston.  (Docket Entry No. 14, Ex. 1 at 32-33). Lara stated that he either never got a response from Coston or his requests were denied.  (*Id*.). Lara submitted affidavits from coworkers, stating they were aware that his request to participate in a special project had been denied.  (Docket Entry No. 16, Ex. 8 and Ex. 9).  Lara stated that he gave presentations in Oklahoma, Dallas, and Denver, but could not recall the last training session he attended.  (Docket Entry No. 14, Ex. 1 at 34)  Coston stated he did not remember Lara asking for any training.  (Docket Entry No. 14, Ex. 12 at 17).

**III.    Analysis**

14

A.       **Discrimination**

Lara maintains that there are genuine issues of fact "as to the interview process and whether [Lara] received a fair opportunity to obtain the position." (Docket Entry No. 15 at 2).  Lara points out that "the posting stated there were two positions and one of those was arguably for Houston." (Docket Entry No. 15 at 5).  Because Houston "holds the vast majority of the minority candidates," having Houston candidates interviewed by telephone was discriminatory.  (*Id.*).  Lara argues that having a phone interview rather than an in-person interview did not afford him the "same opportunity to communicate non-verbally" and provided him with "less time to prepare" than other applicants.  (Docket Entry 1 at 3).  According to Lara, the applicants who interviewed in Denver "had the benefit of a face to face interaction, of not only being able to react and respond to the non-verbal communications of the interviewing panel."  (Docket Entry No. 15 at 5).

The Secretary argues that summary judgment is appropriate because MMS had a legitimate, nondiscriminatory reason for not promoting Lara:  he was not the most qualified candidate for the position.  (Docket Entry No. 13 at 1).  The Secretary contends that even if Lara "can establish a prima facie case of national origin and/or sex discrimination" for his hiring claim, the undisputed evidence in the record shows that the candidate who was selected for the position instead of Lara was better qualified for the position.  (Docket Entry No. 13 at 8).  The Secretary maintains that the evidence shows that interview format and locations were "dictated by the geographic location of the candidates."  (Docket Entry No. 17 at 2).

Lara has neither submitted nor identified direct evidence of discrimination, making the

15

*McDonnell Douglas* framework applicable.[2]  Lara is a member of a protected class and he did seek

an available position in MMS for which he was qualified.  The position went to someone outside

the protected class.  Lara has made a *prima facie* showing of a discriminatory failure to promote.

The Secretary has met his burden of proffering a legitimate, nondiscriminatory purpose for not

promoting Lara:  there were other, better qualified candidates.  This is a burden of production, not

persuasion.  *Rios v. Rossotti*, 252 F.3d 375, 379 (5th Cir. 2001).  The Secretary has provided,

through the introduction of admissible evidence, the reasons for Lara's rejection.  Under the

*McDonnell Douglas* framework, the burden shifts back to Lara to show that there is a genuine issue

of material fact as to whether MMS's stated reason for not promoting Lara is not true and merely

a pretext for discrimination, or that it is true but discrimination was a  motivating factor for the

decision not to promote him.  *Burrell*, 482 F.3d at 411-12.

"The pretext inquiry focuses on the authenticity of the employer's preferred reason."  *Nasti,*

492 F.3d at 594.  Under "appropriate circumstances" the trier of fact may infer from the falsity of

the employer's explanation whether the employer is covering up a discriminatory purpose.  *Id*.

(quoting *Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L. Ed. 2d 225 (1992)).  "A court

may infer pretext where a defendant has provided inconsistent or conflicting explanations for its

conduct."  *Id*.  The Secretary has consistently argued that the decision not to promote Lara was based

---

[2]

   "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact
(i.e. unlawful discrimination) without any inferences or presumptions."  *Nichols v. Loral Vought Sys. Corp.*,
81 F.3d 38, 40 (5th Cir. 1996) (citing *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir. 1993).
("[W]hen a person or persons with decision making authority evinces racial animus that may constitute direct
evidence of discrimination."  *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005).
"[S]tatements or documents which show on its face that an improper criterion served as a basis--not
necessarily the sole basis, but a basis--for the adverse employment action are direct evidence of
discrimination."  *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003).

on his qualifications as compared to the other candidates, measured by a set of objective standards.

The undisputed evidence shows that the decision to interview Lara over the phone was based on geography.  Although the posting had identified two possible openings, one in Denver and one in Houston, when the interviews were held, the decision had been made to fill only the Houston vacancy because of budgetary reasons.  All the Houston-based candidates were interviewed by telephone.  All the Denver-based candidates were interviewed in person.  Muniz testified in her deposition that  seven of the seventeen interviews were conducted over the phone.  (Docket Entry No. 14, Ex. 5 at 37).  Muniz also stated that "some of the best interviews we had were with individuals over the phone."  Two applicants interviewed over the phone ranked in the top third of the candidates.  (*Id.*).  The evidence does not raise a disputed fact issue as to whether the decision to fill only one vacancy, in Denver, or the decision to interview only the Denver-based candidates in person and the others by telephone, were motivated by discrimination.

Nor has Lara raised a fact issue as to whether the selection of Elmore was discriminatory.  Although Lara had more seniority in the agency, Elmore had considerably more relevant experience for the new position.  Elmore's resume shows experience at the managerial level that Lara does not have. (Docket Entry No. 14, Ex. 10).  Lara ranked eleventh out of seventeen candidates interviewed, taking into account experience, responses to the questions on the vacancy announcement, and the interview.  All members of the panel concluded that "although Lara met the minimum qualifications, Ms. Elmore was the best candidate for the job."  (Docket Entry No. 13 at 10).

A plaintiff may create a fact issue by providing or identifying evidence that he was "clearly better qualified" than the employee chosen for the position, not merely "similarly qualified." *Sabzevari v. Reliable Life Ins. Co.*, 264 Fed. App'x 392, 395 (5th Cir. 2008); *see also Manning v.*

17

*Chevron Chem. Co.*, 332 F.3d 874, 882 (5th Cir. 2003); *Celestine*, 266 F.3d at 356-57.  "However, the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Id.* at 357 (*quoting Deines v. Tex. Dept. of Prot. & Regulatory Servs.*, 164 F.3d 277, 280–81 (5th Cir. 1999)).  Evidence that a plaintiff was "clearly better qualified" than the employee chosen for the position "must be more than merely subjective and speculative." *Eberle v. Gonzales*, 240 Fed. App'x 622, 630 (5th Cir. 2007) (quoting *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996)).[3]

Lara has not provided or identified evidence that he was "clearly better qualified" than Elmore for the position.  The record does not show disputed facts material to determining whether the Secretary's stated reason for selecting Elmore over Lara for promotion was a pretext for unlawful discrimination or that discrimination was a motivating factor in the decision.  *See, e.g.,*

---

[3]

The Supreme Court has recognized that evidence of a plaintiff's superior qualifications may establish pretext "in some circumstances." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-57, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006) (per curiam).  The Court noted that several circuits find an inference of pretext only if "the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face." *Id.* The Court rejected this standard but declined to "define more precisely what standard should govern pretext claims based on superior qualifications." *Id.* at 458.  The "clearly better qualified" standard set forth by the Fifth Circuit is not similar to the standard the Court found faulty in *Ash*. *See, e.g., Celestine*, 266 F.3d at 357; *Manning*, 332 F.3d at 882; *see also Bright v. GB Bioscience, Inc.*, 2008 WL 5210657, at *7 n.8 (5th Cir. Dec. 15, 2008) (recognizing that although *Ash* disapproved of the "jumping off the page" standard as "unhelpful and imprecise," the Fifth Circuit's more precise definition of the comparative qualifications standard set forth in *Deines* is good law); *Gillaspy v. Dallas Indep. Sch. Dist.*, 278 Fed. App'x 307, 313-14 (5th Cir. 2008) ("We are confident that [our "clearly better qualified"] standard comports with the directive in *Ash* to formulate a better standard   [than "slap in the face"] to govern pretext claims based on superior qualifications."); *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 412 (5th Cir. 2007) (recognizing, post-*Ash*, that a plaintiff may prove pretext by showing that he was "clearly better qualified" than the person selected for the position); *Runnels v. Texas Childrens Hospital Select Plan*, 167 Fed. App'x 377, 383 (5th Cir. 2007) (applying the "clearly better qualified" standard, post-*Ash*).

*Burrell*, 48 2 F.3d 411-12.   The summary judgment evidence shows that Elmore had better managerial experience than Lara and performed better in the interview.  Robinson's affidavit, stating that she believed that Elmore was hired over more qualified minority candidates, is not sufficient to raise a fact issue because there is no evidence that Robinson had access to the information about Elmore's credentials, the interview process, or how Elmore compared to other candidates.

The Secretary has not provided "inconsistent or conflicting explanations" for hiring Elmore over Lara.  *See Wright*, 505 U.S. at 296.  The Secretary has submitted competent summary judgment evidence that the promotion decision was based on clear objective standards and that the hiring decision was within the managerial discretion of MMS and not a pretext for racial or sexual discrimination against Lara.  The evidence submitted by the Secretary shows that MMS could easily have believed Elmore to be the more qualified candidate for the position, based on her own qualifications and Lara's scoring in the application process.

Lara has failed to meet his burden to raise a fact issue as to discrimination.   The motion for summary judgment on the discrimination claim is granted.

### B.    Retaliation

It is undisputed that Lara engaged in protected activity when he complained of employment discrimination.  Lara asserts that he was subject to an adverse employment action when, as a result of his discrimination complaint, "he began to lose opportunities and rights given to others, people began to disassociate with him, including his new boss at the time, Clifford Coston . . . and his professional image was eventually tarnished for future opportunities." (Docket Entry No. 15 at 6-7).  The Secretary argues that Lara cannot make a *prima facie* showing of retaliation because his claims do not rise to the level of actionable adverse employment actions there is no basis to find a causal

link between the alleged retaliatory acts and his protected activity. (Docket Entry No. 13 at 16-17). The Secretary also argues that Lara cannot refute MMS's legitimate, nondiscriminatory reasons for the alleged retaliatory acts.

The record is insufficient for a *prima facie* showing of retaliation. Although Lara has satisfied the first prong of a *prima facie* case, his allegations and evidence do not show adverse employment actions. Even assuming that Lara has satisfied this second prong, the elapsed time between his EEO complaint and the alleged adverse employment actions is too long to show a causal link, the third prong of a *prima facie* case.

"Adverse employment actions" as defined by the Supreme Court in *Burlington Northern* are not limited to "those that are related to employment or occur at the workplace" and include "employer actions that would have been materially adverse to a reasonable employee or job applicant." 548 U.S. at 67. For an action to be considered an "adverse employment action" in a *prima facie* case for retaliation, the plaintiff must show "that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id*. at 68 (quoting *Rochon v. Gonzalez*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). This definition does not include "petty slights or minor annoyances that often take place at work and that all employees experience." *Id*. This is an objective standard that depends on the specific facts and circumstances of each case. *Id*. at 69.

The incidents involving Lara's personal radio,[4] Coston's allegedly "condescending and

---

[4]      In his deposition, Coston stated that there was no written policy at MMS on the use of personal radios, and that "as long as the radio does not interfere with other workers in the area they are allowed."

unprofessional speech,"[5] Lara's yearly review over the phone,[6] request for vacation leave,[7] printing

all the documents from his "My Documents" folder for review,[8] and the telework denial[9] are not

---

(Docket Entry No. 14, Ex. 12 at 32).  Coston stated that if a radio is bothering an employee, he will notify his supervisor or manager.  (*Id.*).  Coston stated that he had received a written complaint from another employee about the volume of Lara's personal radio, after asking Lara to either turn down his radio or use headphones.  (*Id.* at 33).  Lara submitted the email from Coston asking him to either use headphones or remove his radio. (Docket Entry No. 16, Ex. 7).  Lara alleges that there were "no options given," but Coston's email clearly states that Lara had the option of wearing headphones and that there had been complaints from other employees.  (*Id.*).

[5]

     Coston admitted that he had raised his voice with Lara on certain occasions, as well as with "every member of [Coston's] team at one point in time."  (Docket Entry No. 14, Ex. 12 at 25).  Coston denied that he ever "yelled at" any of the auditors he supervised at MMS.  (*Id.* at 26).

[6]

     Lara alleges that he was given his yearly performance review over the phone rather than in-person, and that Coston did not have a copy of Lara's review in front of him at the time.  (Docket Entry No. 15 at 9).  Lara alleges that when he questioned the rating he received in that review, Coston threatened to lower his rating further.  (*Id.*).  Coston states in his deposition that Lara's rating was done over the phone, but that his feedback session afterwards was done in a conference room with Lara, a supervisor, a team leader and Coston present.  (Docket Entry No. 14, Ex. 12 at 23-24).  Coston stated that he was out of town at the time he was required to complete his ratings, so he gave his entire team their ratings over the phone.  (*Id.* at 24).  Coston contends he did have a copy of Lara's review with him during the phone conversation, informed Lara he had a copy at the time, and denies that he threatened to lower Lara's rating.  (*Id.*).

[7]

     Coston states that he did not have the authority to approve Lara's vacation request because it was over 40 hours, and that he did not know of any guidelines for managers for deadlines to answer vacation requests. (Docket Entry No. 14, Ex. 12 at 31).

[8]

     Coston denies he requested Lara to print his entire "My Documents" folder.  Coston states he requested Lara's work schedules only.  (Docket Entry No. 14, Ex. 12 at 35).

[9]

     In his deposition, Lara stated that he was "removed from telecommuting" because of his work "not being reviewed timely."  (Docket Entry No. 14, Ex. 1 at 37).  Lara alleged that his colleagues were later allowed to return to their telecommuting schedules but he was not.  (*Id.* at 38).  Lara admitted that he based this judgment on observing who was working in the office, and that he never had access to HR documents on telecommuting.  (*Id.* at 39).  Coston stated that he did not approve telecommuting requests; the previous supervisor had already set the telecommuting schedules.  (Docket Entry No. 14, Ex. 12 at 26-27).  Coston stated that he removed his entire team from telecommuting because of poor work performance, and that "as their work performance improved, they were allowed to go back to telecommuting."  (*Id.* at 29).

actionable.  These acts are not materially adverse and would not dissuade a reasonable employee

from making or sustaining an allegation of discrimination.  *See Burlington Northern*, 548 U.S. at 63;

*see, e.g.*, *Stewart v. Mississippi Trans.* Commission, No. 08-60746, 2009 U.S. App. LEXIS 23089

(5th Cir. October 21, 2009) (finding that allegations including taking of personal items from

employee's desk, changing of locks on employee's office door and chastising and ostracizing by co-

workers were "petty slights, minor annoyances, and simple lack of good manners" and not materially

adverse, while placing an employee on paid administrative leave is not necessarily a "petty slight"

and depends on the circumstances); *Mitchell v. Snow*, 326 Fed. App'x. 852 (5th Cir. 2009)

(upholding the District Court's holding that an employment review lower than the employee plaintiff

expected would not have dissuaded a reasonable employee from asserting discrimination, and that

the  plaintiff presented no evidence to support allegedly more serious conduct by her employers);

*Browning v. Southwest Research Inst.*, 288 Fed. Appx. 170 (5th Cir. 2008) (finding that a based on

the facts, a "heated exchange of words in a work place confrontation" did not constitute retaliation,

and amounted to the 'petty slights' or 'minor annoyances' that all employees face from time to

time).

Even if such allegations as Coston's failure to provide Lara with the training and coaching

he required and requested could be "adverse employment actions," the court need not address that

question because the record does not show a genuine issue of fact as to the third prong of the *prima*

*facie* case of retaliation, a causal link between the alleged "adverse employment action" and his EEO

complaint.  *See Peace*, 207 Fed. App'x. at 369 ("Although [plaintiffs's] pay and performance-award

delays and her claim of constructive discharge relating to her retirement could plausibly be

construed as 'adverse employment actions,' we need not address that question because, as with *all*

incidents upon which she relies, [plaintiff] fails to create a genuine issue of material fact as to the existence of the third element of a *prima facie* retaliation case: a causal link between the incident and her EEOC complaint.").

The causal link element of the *prima facie* case does not rise to the level of a "but for" standard. *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002). "The plaintiff 'need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a *prima facie* case." *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996) (additional citations omitted)). "A 'causal link' is established when the evidence demonstrates that the employer's decision to terminate was in part on knowledge of the employee's protected activity." *Medina*, 238 F.3d at 684. "If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." *Chaney v. New Orleans Public Facility Management, Inc.*, 179 F.3d 164, 168 (5th Cir. 1999) (citing *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 267 (5th Cir. 1994)).

If an employer does not know of the employee's protected activity during the time of the alleged adverse employment actions, the employer cannot be said to have retaliated against the employee. *Chaney*, 179 F.3d at 168. Both sides agree that Coston had nothing to do with the interview and selection process for the Lead RIK Specialist position. (Docket Entry No. 14, Ex. 1 at 40). Coston supervised Lara from January to September 2007. In his deposition, Coston testified that he was not "familiar with" Lara's EEO complaint during that time. (Docket Entry No. 14, Ex. 12 at 36-37). There is no evidence to raise a fact issue that Coston was aware of the EEO complaint.

23

"Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. GSA*, 110 F.3d 1180, 1188 (5th Cir. 1997) (citing *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993)).  It is not always enough to establish a causal link to show that an adverse action is taken sometime after the plaintiff engages in a protected activity.  *Id.* at n.3; *see, e.g., Richard v. Cingular Wireless LLC*, 233 Fed.App'x. 334, 338 (5th Cir. 2007) (finding that two and a half months is a short enough period of time between the protected activity and the alleged act of retaliation to support an inference of a causal link); *Raggs*, 278 F.3d at 471-72 (finding that a five month lapse by itself did not support an inference of a causal link).

Lara filed his administrative discrimination complaint in November 2006.  (Docket Entry No. 14, Ex. 3).  According to Lara's interrogatory responses, the alleged adverse employment actions taken by Coston began in May 2007 and continued through the fall of 2007.  (Docket Entry No. 14, Ex. 11 at 7-10).  There was a period of time of approximately five months between the protected activity and the alleged retaliatory acts.  Close timing between the protected activity and an alleged adverse employment action can help establish a *prima facie* case of retaliation, but "temporal proximity alone is insufficient" to prove causation.  *Strong v. Univ. Health Care Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).  The Fifth Circuit has "only allowed lapses of up to four months to go to the jury." *Campbell v. England*, 234 Fed. Appx.183, 188 (5th Cir. 2007) (citing *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (noting that a time lapse of up to four months is enough to satisfy the causal connection requirement for summary judgment purposes). The Supreme Court has cited cases that held three and four month time periods between events as insufficient for a *prima facie* case of retaliation.  *Clark County Sch. Dist.*, 532 U.S. at 274 (citing

*Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (finding that a three-month period is insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (finding a fourth-month period insufficient)).  It appears that the five months between Lara's protected activity and the alleged retaliatory acts by Coston is too long to support a causal link for a *prima facie* case of retaliation.

The Secretary's motion for summary judgment on the retaliation claim is granted.

### C.      Hostile work environment

Lara's hostile work environment claim is based on the same incidents of alleged retaliation by Coston; personal radio usage, "condescending and unprofessional speech," the phone evaluation, vacation leave request, denial of coaching and training, denial of telecommuting opportunity, printing of all documents in "My Documents" folder, and "abusive behavior and an array of negative emails."  (Docket Entry No. 15 at 9-10).  The Secretary notes that it is not clear from Lara's pleadings whether the instances of alleged mistreatment by Coston are "the basis of a retaliation claim or a hostile work environment claim."  (Docket Entry No. 17 at 2-3).  Lara argues that this alleged harassment "happened in many different forms and on such a regular basis that it altered the conditions of his employment."  (Docket Entry No. 15 at 12).  He states that the alleged harassment made him feel "humiliated, degraded and embarrassed" in front of his co-workers.  (*Id.*).  The Secretary argues that "the complained of actions do not rise to the level of a hostile work environment," and that Lara has failed to show that the alleged harassment was based on Lara's sex, race, or national origin.  (Docket  Entry No. 17 at 3).

The elements of a hostile work environment claim are: (1) the plaintiff belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his

membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) his employer knew of or should have known of the harassment and failed to take prompt remedial action. *Ramsey*, 286 F.3d at 268. The Secretary does not dispute that Lara is a member of a protected group. Lara does not have to satisfy the fifth element because almost all of the incidents of alleged harassment were committed by his supervisor, Coston. (Docket Entry No. 15 at 12); s*ee Celestine,* 266 F.3d at 353-54 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

For conduct to be actionable as harassment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey,* 286 F.3d at 268 (internal quotation marks and citation omitted); *Watkins v. Texas Dept. of Criminal Justice*, 269 Fed. App'x 457, 463-464 (5th Cir. 2008). "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill v. Westward Communications LLC*, 433 F.3d 428, 434 (5th Cir. 2005) (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)). The Supreme Court has made clear "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"

The evidence, viewed in the light most favorable to Lara, does not show comments or conduct that is so offensive or frequent as to give rise to a hostile work environment. There is no indication that any of the alleged incidents of harassment in Lara's office were racially or sexually offensive in nature. *See Vallecillo v. U.S. Dep't of Housing and Urban Dev.*, 155 Fed. App'x 764, 767 (5th Cir. 2005) (affirming summary judgment on a hostile work environment claim when the

complained-of harassment was not based on the plaintiff's race or national origin).  Lara relies on much of the same conduct for the allegations of retaliation and a hostile work environment.  For some of the same reasons that Coston's conduct did not rise to the level of retaliation in violation of Title VII, the conduct does not rise to the level of support for a hostile work environment claim.

Lara does include some additional allegations in his hostile work environment claim, specifically that he was "consistently confronted with abusive behavior and an array of negative e-mails." (Docket Entry No. 15 at 10).  The only e-mails from Coston that Lara submitted to the court pertain to the following subjects:

- the use of his personal radio, (Docket Entry No. 16, Ex. 7);

- the delay in his performance review, (Docket Entry No. 16, Ex. 11);

- a response to Lara's request to attend training, citing "lack of progress in completing assignments," (Docket Entry No. 16, Ex. 14);

- a question about how much time Lara would need for an assignment, (Docket Entry No. 16, Ex. 22);

- a discussion over an argument that allegedly occurred in Coston's office, (Docket Entry No. 16, Ex. 24); and

- a request that Lara see Coston immediately to discuss "serious concerns" about Lara's assignment, (Docket Entry No. 16, Ex. 25).

The e-mails Lara submitted do not raise a disputed question material to determining that there was no hostile work environment.  The motion for summary judgment on the hostile work environment claim is granted.

**IV.    Conclusion**

27

The Secretary's motion for summary judgment is granted.  Final judgment is entered by separate order.

SIGNED on November 25, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge